**DE BACK v. UNITED STATES.**

No. 20410–S.

District Court, N. D. California, S. D.
Sept. 14, 1939.

142

Young, Hudson & Rabinowitz, of San Francisco, Cal., for plaintiff.

Frank J. Hennessy, U. S. Atty., and Sydney P. Murman, Asst. U. S. Atty., both of San Francisco, Cal.

ST. SURE, District Judge.

Plaintiff, who was injured while a passenger for hire upon one of the trains of the Alaska Railroad operated as a common carrier by the Government,[1] sues for damages for personal injuries under authority of a private act of Congress.[2]

The complaint charges general negligence in the operation of the railroad, which is denied, and contributory negligence on the part of plaintiff is alleged.

The Government moves to dismiss upon two grounds: first, that the court lacks jurisdiction to consider plaintiff's claim for $55,315.65 because consent has not been given by Congress to sue for such an amount; second, that upon the facts and

the law the plaintiff has shown no right to relief,[3] the equivalent of a motion for nonsuit.

■ 1. By the terms of the private act "consent is hereby granted to Minnie C. de Back, of San Francisco, California, to sue the United States of America in an action at law for general and special damages by reason of personal injuries alleged to have been sustained by her on or about July 3, 1931, while a passenger for hire aboard one of the trains of the Alaska Railroad, operated * * * by the United States of America * * * together with the right to either party to appeal from any judgment which may be entered in said action." Section 2 confers jurisdiction upon this court "to hear, determine, and render judgment upon said claim." Section 3 fixes the liability of the United States. "In the determination of such claim, the United States of America as defendant in such action shall be held liable for any tort committed by any of its instrumentalities, officers, agents, employees, or servants in the same manner and to the same extent as if it were a private person." Section 4 provides for the commencement of the suit within one year after the enactment of the act, "notwithstanding the lapse of time or any statute of limitation," and ties the private law to the Tucker Act (Par. 20 of Sec. 24 Judicial Code, 28 U.S.C.A. § 41(20) with these words: "and proceedings for its determination shall be in accordance with Paragraph Twentieth of section 24 of the Judicial Code, as amended."

The Tucker Act provides in part: "The district courts shall have original jurisdiction * * * Concurrent with the Court of Claims, of all claims not exceeding $10,000 founded upon * * * any law of Congress, * * * or for damages, liquidated or unliquidated, in cases not sounding in tort, * * *."

It is upon this provision and the last clause of section 4 of the private act, quoted above, that the Government bases its claim of lack of jurisdiction. A reading and comparison of the private act with the Tucker Act shows them to be entirely different. The latter does not permit of a tort action, while the former does. In no

---

[1] Act of Congress of March 12, 1914, Vol. 38, part. 1, p. 305, Stats., 48 U.S.C.A. §§ 301–308.

[2] Chapter 854, Vol. 50, part 2, p. 1094, Stats.

[3] 41(b) Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

sense is the jurisdiction or the liability of the United States limited in the private law, while in the Tucker Act it is. The language of the private act permitting suit, conferring jurisdiction, and fixing the liability of the Government is explicit and unmistakable. Its meaning is perfectly clear. There is no ambiguity whatever, and therefore no room for statutory interpretation and construction. The clause "proceedings for its determination shall be in accordance with" the Tucker Act, simply means that the procedure in the Tucker Act requiring trial without jury shall be followed, and it was here.

2. Upon the merits the essential facts are not in dispute. Plaintiff, fifty-four years of age, in good health, and free from physical infirmities, was on a pleasure trip, her first to Alaska, when the accident happened. She boarded a standard train of defendant at Seward, Alaska, on July 3, 1931. She was seated in a steel car having heavy movable chairs before windows on either side. The excursion was through mountainous country, and the track had many curves. The speed of the train was fixed by defendant's servants at between eighteen and twenty-five miles per hour. There was testimony that warnings were given of curves, but plaintiff heard none. She arose and was about to turn her chair to better observe the scenery when the train gave an unusual lurch or violent jerk, and she was thrown to the floor and suffered a fracture of the right hip.

All of the witnesses in the observation car noticed that the train swerved, jerked, or lurched as it rounded a curve. Some of the passengers were standing at the time, but were not injured. Plaintiff testified that when she got up and was turning around, the car gave a lurch which threw her to the floor. A porter in the observation car was a witness for the Government. He had been employed by the Railroad for about six years. He testified, "We were rounding a curve and approaching a small bridge. I was at the rear end of the observation car and I felt the swaying motion, * * *. I turned around and faced the front end of the car in time to see this lady [plaintiff] fall." Under cross-examination the witness said that he had made several trips in the observation car as porter, and that it was the first time that he had noticed the train lurch. The

track was straight, approaching "a long sweeping curve * * *.

"Q. Did you notice a particular lurching to the train just as Mrs. de Back fell? A. I don't know whether it was swaying or was just a lurch.

"Q. It was a lurch or jerk which caused you to turn around? A. Yes. It was more of a lurch than a jerk.

"Q. By lurch, do you mean a sudden tipping-like of the car? A. Yes.

"Q. Can you distinguish a lurch from a jerk? A. A jerk would be where the engine was at a stop and the engine started with a bang and you felt it.

"Q. A lurch, you mean, is a side motion? A. Yes."

The testimony of the porter indicates that the train was traveling too fast when it hit the curve. There was a distinct jerking or swerving as the lady fell, declared the witness.

The plaintiff was not at fault in arising from her chair and attempting to turn it to afford her a better view. She was in an observation car filled with sightseers like herself, and was bent on fully enjoying the Alaskan scenery. Her action was perfectly natural under the circumstances, and in no manner proximately contributed to her injury.

The theory of counsel for plaintiff that the doctrine of res ipsa loquitur applies is tenable under the facts. The plaintiff has no knowledge of just what caused the accident, and the instrumentality by means of which it occurred was solely within the control of defendant. In such case negligence will be inferred upon proof of a prima facie case, in the absence of adequate explanation on the part of the defendant exempting it from liability.[4] Counsel for the Government cites the case of Chesapeake & O. Ry. v. Needham, 4 Cir., 244 F. 146, where it was held that swaying or lurching of cars necessarily incident to proper operation of fast passenger trains at curves in the track, whereby a passenger is injured, does not charge the carrier with negligence, but the risk thereof is assumed by the passenger. It cannot be maintained that the swaying and lurching in the instant case was necessarily incident to the proper operation of defendant's train, which was not a fast

---

4 Jianou v. Pickwick Stages System, 111 Cal.App. 754, 756, 296 P. 108; Kenney v. Antonetti, 211 Cal. 336, 295 P. 341.

passenger, but an excursion train. The porter who was in the rear of the car when the swaying and lurching began was so startled that he immediately swung around in time to see plaintiff thrown to the floor. Such lurching and sudden tipping had never happened before in his experience.

Plaintiff was taken from the train at Anchorage where defendant maintained a railroad hospital. Dr. Romig, Chief Surgeon of the hospital, met plaintiff at the train with an ambulance. After x-rays were taken, it was found that plaintiff had suffered a "fracture of the right femur in the neck between the head and the shaft." The patient being in a state of shock was put to bed. The next morning she was anaesthetized and the break set. She was put in a "fixed position," her legs were placed "in abduction, well apart, after setting the break, so that the fragments would stay together, and put her in a cast from the feet to the arms." The plaster of paris cast encased both legs, spread apart, in order to hold the fracture in rigid position. Lying on her back in this "fixed position" plaintiff remained at the hospital until September 4, 1931. She was attended by nurses day and night. Accompanied by a nurse she was transported by train and boat to San Francisco. Plaintiff was never billed for any of the treatment given her at Anchorage. "We had instructions not to charge her for anything," said the Doctor. Defendant paid railroad and boat fare for plaintiff and the nurse to San Francisco. Upon arrival in San Francisco plaintiff was taken to a hospital, where it was found necessary to replace the cast put on at Anchorage by another. For a second time she was placed in a "fixed position," both legs in a plaster cast. She was discharged from the hospital in San Francisco after an additional three months of suffering.

Counsel for plaintiff stresses the fact that "the Government provided hospitalization, medical and surgical attendance, nursing care and transportation" without pay, and suggests that "all of these acts can be construed only as conduct amounting to admission of liability." The conduct of defendant's agents was not only humane, but extraordinary. Unexplained, such generosity is quite significant. And it is within the range of probability that it was induced by the belief of defendant's agents that plaintiff's injuries were caused by the negligent operation of the train.

Defendant's motion to dismiss will be denied. Plaintiff has proved her case and is entitled to recover damages, both general and special. Her injury is permanent and she undoubtedly suffered great pain therefrom. She will be awarded $5,000 as general damages. The expenses paid by plaintiff for hospitalization and surgical care in San Francisco amount to $5,213.75, and she will be allowed this sum as special damages. The total judgment in favor of plaintiff and against defendant will be $10,213.75.